UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION


UNITED STATES OF AMERICA,    ) April 29, 2019
                             )
              Plaintiff,     ) Greenville, SC
                             )
                             )
         vs.                 )
                             )
DONALD NATHANIEL THOMAS, JR., ) Case no(s).:8:19cr181-DCC-2
                             )
              Defendant.     )


TRANSCRIPT OF DETENTION/BOND HEARING

BEFORE THE HONORABLE JUDGE JACQUELYN D. AUSTIN
UNITED STATES MAGISTRATE JUDGE, presiding


A P P E A R A N C E S :


For the Plaintiff:  LEESA WASHINGTON, Esquire
                    US Attorneys Office
                    55 Beattie Place, Suite 700
                    Greenville, SC 29601


For Defendant:      CLARENCE RAUCH WISE, Esquire
                    305 Main Street
                    Greenwood, SC 29646-2757


Court Reporter:     Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
                    300 E. Washington Street, Room 304
                    Greenville, SC 29601


Proceedings recorded utilizing digital recording and transcript
produced by computer-aided transcription.

# P R O C E E D I N G S

(Proceedings began at 11:16 a.m.)

   **THE COURT:** Yes, ma'am.

   **MS. WASHINGTON:** Your Honor, the next case is United States of America versus Donald Thomas, Junior. It's docket Number 8:19-181. Mr. Thomas is present in the courtroom, and he's represented by Rauch Wise.

   **THE COURT:** Okay.

   **MS. WASHINGTON:** Judge, on February 26, Mr. Thomas and others were arrested on an indictment issued out of this district. At that time, the defendant appeared before Your Honor. The government moved for detention. At the time, Mr. Thomas waived detention. It's my understanding that Mr. Thomas filed a motion for bond on April 23. The government maintains its position that Mr. Thomas should be detained pending trial.

   I've spoken with Mr. Wise this morning. It's the government's intention to proffer the government's evidence as to detention. I don't think Mr. Wise has an objection. The case agent is here, Special Agent Randy Smith, and he will be made available for cross-examination, if need be.

   **THE COURT:** Okay. Mr. Wise, are -- do you have any objection to the government proffering their evidence this morning?

   **MR. WISE:** That's -- that's fine, Your Honor.

1    **THE COURT:** Okay. And you're prepared to go forward

2 this morning, as well?

3    **MR. WISE:** Yes, ma'am.

4    **THE COURT:** Okay. I'll have the government go ahead

5 and put their evidence on the record ---

6    **MS. WASHINGTON:** Your Honor ---

7    **THE COURT:** --- supporting detention.

8    **MS. WASHINGTON:** --- the government understands that

9 Your Honor has presided over a number of hearings in this case

10 and has viewed several search warrant applications, so I'll try

11 to be as brief as possible. But just for background, on

12 February 19, Mr. Thomas and 11 others were charged in a

13 multi-count indictment as it relates to -- specifically as to

14 detention and the presumption that applies in this particular

15 case. Mister -- a grand jury found probable cause that

16 Mr. Thomas and others committed the offense of conspiracy with

17 intent -- conspiracy to possession with intent heroin, cocaine,

18 and fentanyl. The grand jury also found probable cause as to

19 Count 2 which charges conspiracy to import the same drugs. The

20 grand jury also found probable cause as to Count 6 of the

21 indictment which charges a violation of Title 18, that is,

22 Title 18, United States Code, Section 924(c), possession of a

23 firearm in connection -- or in furtherance of a drug

24 trafficking crime.

25    Your Honor, this investigation began as early as 2016

1    locally by Greenwood Police Department and Greenwood County

2    Sheriff's Office. DEA and FBI became involved later. The

3    investigation was initiated based on the increased number of

4    opioid -- particularly fentanyl -- related overdoses and

5    deaths. As a matter of fact, since 2017, the coroner in

6    Greenwood County confirmed there were 23 fentanyl-related

7    overdoses in Greenwood County, since 2017.

8            Turns out that in September, on September 26, 2018,

9    DEA office in Las Cruces, New Mexico, contacted DEA in this

10   district and reported that an individual, a Jamaal Latimer, had

11   contacted a source of theirs, a cooperating source, whom he

12   believed resided in Mexico, looking to purchase a significant

13   quantity of heroin and cocaine, 10 kilograms of heroin and 10

14   kilograms of cocaine. DEA in New Mexico forwarded that

15   information, or contacted the office here, inquired about the

16   legit -- legitimacy of the ability, first of all, to buy that

17   amount of drugs, the identity of the -- of Latimer and the

18   others who were looking for that amount of drugs.

19           A decision was made to follow up on the inquiry. DEA

20   in New Mexico contacted Mr. Latimer and scheduled a visit to

21   meet with him in El Paso to hammer out the details.

22   Surprisingly, Mr. Latimer actually boarded a flight from

23   Atlanta on October 2, 2018, along with another individual whom

24   the government does not believe was intricately involved in the

25   conspiracy, to meet with these agents. At the time,

Mr. Latimer, of course, believed that he was meeting with a
source out of Mexico; did not know that he was actually talking
to and going to be meeting with undercover DEA agents.

On October 2, 2018, Mr. Latimer and another
individual drove to Atlanta from the Upstate of South Carolina
to board a flight from Atlanta to El Paso. According to bank
records, Mr. Thomas's bank records, Mr. Thomas -- Mr. Thomas's
credit card was used to pay for both tickets. Each ticket was
about $950.

Once Mr. Latimer made it to El Paso and met with the
agents, the agents arranged a recorded meeting with
Mr. Latimer. During that recorded meeting, Mr. Latimer told the
agents that he was in business, the drug business, that is,
with individuals in South Carolina. He described those
individuals as being in the nightclub and car sales business.
Mr. Thomas is actually in -- or purports to be a used car
salesman. He owns his own business in the Greenwood -- in
Greenwood County.

Mr. Latimer also told the agents -- unbeknownst to
Mr. Latimer at the time he was being recorded and was actually
meeting with law enforcement -- that the organization's
previous supplier had proven not to be reliable and they were
looking for another source. Mr. Latimer, during that recorded
meeting, contacted Mr. Thomas via FaceTime, and talked to
Mr. Thomas about how the meeting was going and that he had made

1    it to El Paso.

2            Mr. Latimer also told the agents during the recorded

3    meeting that his organization, including Mr. Thomas,

4    manufactured heroin pills out of the drugs that they received.

5    In other words, they would receive heroin in powder form and

6    would convert it to pill form using a pill press. Mr. Latimer

7    said that the car business -- the car lot -- the used car and

8    the nightclub business, which was, at that time, purportedly

9    owned and ran by Detric McGowan, who is the lead defendant in

10   this case, was used -- were used -- both of those businesses

11   were used as a front for their drug trafficking business.

12   Mr. Latimer specified that he wanted 10 kilograms of cocaine;

13   and the 10 kilograms of heroin, he specified that it be China

14   White heroin, meaning that he wanted it to be cut with

15   fentanyl.

16           Mr. Latimer, during that meeting, described

17   Mr. Thomas as his brother. Don't know if there's a familial

18   relationship, but that's how he, at that time at least,

19   described Mr. Latimer. Mr. Latimer told the agents that he was

20   -- that their -- the way they operated was that they used the

21   club to sell some of the drugs and that they -- he was

22   specifically requesting fentanyl and wanted to know how much

23   cut or additive could be added to the fentanyl so the China

24   White heroin to be supplied by the El Paso organization, or the

25   organization he believed was -- he was meeting with in El Paso,

1 how much cut or additive could be used in addition to -- how

2 much cut or additive could be added to the powder substance

3 that he was to be receiving from this organization. Cut is an

4 additive usually -- generally used by drug traffickers to

5 increase the volume, thereby increasing the traffic margin for

6 folks who sell drugs. Mr. Latimer stayed in El Paso for maybe

7 two days tops.

8 Afterwards, he came back to South Carolina but

9 continued to be in touch with the agents -- the undercover

10 agents in El Paso, and eventually arranged for the transaction,

11 that is, for the 10 kilos of coke and the 10 kilos of China

12 White heroin to be delivered to Greenville on October 23, 2018.

13 During -- between the time Mr. Latimer arrived back in

14 Greenville and October 23, 2018, there were numerous calls

15 between Mr. Latimer and the individuals -- and the undercover

16 agents in El Paso concerning the transaction, discussing the

17 details, indicating his willingness and ability to carry out

18 the transaction. That being -- specifically, law enforcement

19 was concerned that this was not going to happen because he was

20 ordering a significant amount of drugs, number one; and number

21 two, the amount of money that he was to be -- that was to be

22 paid was about $760,000.

23 Lo and behold, on October 23, when the agents arrived

24 supposedly to deliver marijuana and cocaine, Mr. Latimer also

25 met with them. Mr. Latimer -- before the transaction was

scheduled to occur on October 23 at an agreed upon location in Spartanburg County, the agents observed Mr. Latimer, Mr. Thomas, Mr. Cunningham, at a residence in Mauldin, South Carolina. They observed those individuals both entering the residence and leaving the residences -- residence -- actually, it was an apartment townhome -- with the duffel bags. It turned out later, during the traffic stop, that those duffel bags contained -- combined, contained over a million dollars.

During the traffic stop, while Mr. Latimer and Mr. Cunningham were en route to Spartanburg County to meet with the undercover agents, the officers seized also from Mr. Thomas in a separate vehicle, a van driven by Mr. Thomas, approximately $248,000, along with a loaded shotgun. Mr. Thomas was the only individual, at that time, inside the van. Minutes earlier, the officer had seized about $758,000 from a vehicle being driven by Mr. Cunningham. Mr. Cunningham was following Mr. Latimer to the meet location in Spartanburg County.

As the officers pulled Mr. Thomas's vehicle over on Interstate 85 and engaged him in the conversation, Mr. Thomas initially told the officers that the money was to be used to buy inventory for his used car business. Minutes later, Mr. Thomas's then girlfriend, Shequita Holloway, who was also charged in the indictment, arrived and explained to agents that the money was also going to be used to buy a house. They seemed to have conflicting stories about the purpose of the money. And

at that time, the agents already knew what the purpose was.

Nevertheless, Mr. Thomas and Ms. Shequita Holloway continued to

lie to the agents about the purpose and source of the cash.

That conversation with the law enforcement on the side of

Interstate 85, on October 23, is the basis of a charge in the

indictment that is in violation of 18 U.S.C. 1001, lying to

federal agents.

Mr. Thomas, apparently prepared to continue in the

lie, on December 28, contacted law enforcement through a lawyer

and asserted that -- to make a claim for the money that was

seized on October 23. That claim didn't, of course, go

anywhere, but apparently Mr. Thomas was prepared to persist in

the lie that the money was legitimately earned and was not to

be used to facilitate a drug transaction.

Judge, Mr. Latimer was -- all of these individuals

were eventually arrested in February of this year. Mr. Latimer

agreed, pursuant to a proffer, to be interviewed by law

enforcement. He was in March, on March 8 and March 14.

Mr. Latimer told the agents during those sessions and that the

drug -- the drug business that he was in was -- involved

Mr. Thomas, Mr. McGowan and others. Mr. Latimer told agents

that beginning around December 2017, at Mr. Thomas's direction,

that he cut four kilograms of heroin and repackaged it, which

yielded, once cutting it -- unpackaging it, cutting it with

whatever additive he decided to use that particular day,

resulted in seven kilograms of heroin. The reason he did that -- and he did it at Mr. Thomas's direction, but the reason he did that was to increase the supply for Mr. McGowan who was, at the time, using the heroin to manufacture fentanyl pills, which was known to all involved.

Mr. Latimer told the agents that that lasted for at least up until August 2018 when they were -- when they started to run out and decided to approach law enforcement or individuals who later turned out to be law enforcement in El Paso. Mr. Latimer told agents that he broke down heroin supplied by Mr. Thomas from some source, out-of-state source, at least four different times. So if he received four kilograms of heroin at least four different times, the four kilograms on at least four different times were converted to seven kilograms. That amounts to about 28 kilograms of heroin from December 2017 until mid-2018.

Additionally, Judge, Mr. Latimer told the agents that between the time of the seizure on October 23, 2018 and January 2019, he supplied Mr. McGowan with four kilograms of heroin; purposely did not let Mr. McGowan know that the source of the four kilograms of heroin was Donald Thomas. Unbeknownst to Mr. Latimer at that time, when he -- in March -- when I say at that time, in March when he was telling the agents about the historical trafficking -- drug trafficking he did with Mr. Thomas, Mr. Latimer was not aware that he had been captured

on a wiretap in -- beginning in December through

mid-February 2019.

Once Mr. Latimer told agents that he supplied four

kilograms of heroin to Mr. McGowan, sourced by Mr. Thomas, the

agents went back and reviewed some of the phone calls

intercepted over the wiretaps, that -- one beginning in the end

of December 2018 and the other February 2019 -- and discovered

multiple calls during which Mr. Latimer and Mr. McGowan and

Mr. Latimer and others discussed the transaction that he

conducted with Mr. McGowan with heroin sourced from Mr. Thomas.

Consistent with what folks involved in this business generally

do, according to Mr. Latimer, the purpose for not telling

Mr. McGowan the source of the dope: number one, apparently,

after the October 23 seizure, there had been a falling out

amongst the members of the group; secondly, Mr. Latimer is, of

course, willing to accept any new customers and had he told

Mr. McGowan that the four kilograms were supplied by

Mr. Thomas, Mr. Latimer would no longer be useful. He couldn't

make any money. According to Mr. Latimer, that four kilos sold

for about -- he charged Mr. McGowan about $198,000 for the

four.

I mentioned a wiretap. The wiretap on Mr. Latimer's

phone ran for a very short time, primarily because during the

wiretap on Mr. Latimer's phone -- which was the very first one

-- Mr. Latimer learned that an individual in North Carolina had

1   been arrested with dope that had been directly provided to that

2   individual, Deondre Miles, by Mr. Latimer. It turns out that

3   the 900 grams of fentanyl pills that Mr. Latimer supplied to

4   Mr. Miles in Charlotte on December 18, 2018 were supplied by

5   Mr. McGowan. When Mr. McGowan learned of Mr. Miles's arrest,

6   Mr. McGowan informed Mr. Latimer, and that caused Mr. Latimer

7   to drop his phone.

8           Prior to dropping his phone though, the agent

9   intercepted calls between Mr. McGowan and Mr. Latimer during

10  which the two discussed this individual, Mr. Miles. Mr. Latimer

11  told Mr. Miles -- again, unbeknownst to him that he was being

12  recorded -- that Mr. Miles was Thomas's customer, another

13  customer that he'd apparently tried to steal from Mr. Thomas;

14  told Mr. McGowan that he had only dealt with him twice. Prior

15  to his dealings with Mr. -- according to Latimer, prior to his

16  dealings with Mr. Miles in November 2018 and December 2018,

17  Mr. Miles was supplied by Mr. Thomas.

18          Mr. Latimer knew Mr. Miles because Mr. Thomas

19  directed Mr. Latimer to deliver cocaine to Mr. Miles in North

20  Carolina multiple times. Not only does Mr. Miles say -- does

21  Mr. Latimer say that Mr. Thomas supplied Mr. Miles, but when

22  Mr. Miles was arrested by law enforcement in North Carolina, he

23  identified Mr. Latimer as "TJ's boy." According to Mr. Latimer,

24  he made multiple trips to North Carolina at Mr. Thomas's

25  direction to deliver coke. He made at least two trips a month,

one to deliver the coke -- each time, at least two kilograms --
and another trip to pick up the money, all at Mr. Thomas's
direction. According to Mr. Latimer, that began in -- early in
2017 and he made no more than 10 trips to North Carolina for
Mr. Thomas, to deliver cocaine to Mr. Miles.

In addition, Judge, in addition to the 28 kilograms
that Mr. Latimer admits to pressing at Mr. Thomas's direction
for sale to Mr. McGowan, in addition to the cocaine that
Mr. Latimer admits and Mr. Miles confirms was supplied by
Mr. Thomas through -- by Mr. Latimer to him in North Carolina,
the organization was also responsible for manufacturing and
distributing heroin pills. In January -- on January 28th of
this month -- of this year, the agents intercepted calls
between Mr. McGowan and an individual in North Carolina during
which the two discussed a transaction that was to occur in
Columbia.

That transaction indeed did occur. Law enforcement
set up surveillance and watched it occur. After the
transaction, Mr. Lopez, Danny Lopez, out of Fayetteville, North
Carolina was arrested; when the officers found out about a
kilogram and a half of heroin pills.

On February 26, Judge, Mr. Thomas and the others were
arrested. At the time Mr. Thomas was arrested, he was found in
possession with about $47,000. That's in addition to the
$250,000, or approximately $250,000, that was taken directly

from him on October 23 and the $760,000 of which he pulled
money to purchase the 10 kilograms of cocaine and heroin. The
government has reviewed Mr. Thomas's tax returns for the
relevant years. For 2016 or 2017, Mr. Thomas reported an income
of about $35,000 combined, which corroborates Mr. Latimer's
statements to law enforcement in El Paso when he said that the
car lot business and the nightclub business were used as fronts
for drug trafficking.

In addition, Judge, law enforcement seized, from
Mr. McGowan's residence, an additional $500,000 and, from stash
houses used by Mister -- known to be used by Mr. McGowan and
Mr. Longshore -- another individual charged in Counts 1 and 2
of the indictment, along with Latimer and Thomas --
approximately 15 kilograms of heroin. Some of which was cut
with not fentanyl, but tramadol, which is an opioid painkiller
that mimics the effects of heroin. The officers also located a
detectable amount of fentanyl.

Your Honor, in addition to the presumption, the
government relies on the Court's consideration of the evidence,
the strength of the evidence in the -- against this defendant
that the government has. I briefly ran through, hit the high
points, or at least I tried to. And the government believes
that it is likely that, if tried, Mr. Thomas would be convicted
as charged.

The nature of the offense, Your Honor, is another

factor the Court is to consider. The offense here, Judge, is particularly serious because what we have here are people, like Mr. Thomas, supplying powder cocaine cut with various substances known to be used to manufacturer fentanyl pills by individuals with no pharmacological knowledge in a uncontrolled environment. There's no way to determine the dosage of each individual pills.

There were at least 15 -- about 15,000 pills of -- heroin pills seized during the January 28 transaction. There were at least 10,000 pills seized from Mr. Miles in December 2018, in Charlotte, North Carolina. The agents seized multiple kilograms of pressed pills during the February 26 arrest and -- execution of search and arrest warrants. Certainly, while all drug offenses have the capacity to be dangerous, the reasons or the purposes and the methods used by this organization make the offenses charged in Count 1 and 2 particularly serious.

As to Mr. Thomas, Judge, based solely on the drug amounts involved, Mr. Thomas is likely -- while under the statute, he's 10 to life on Count -- as to Count 1 and Count 2, on Count 6, he's 5 to life for possession of a firearm in furtherance of a drug offense under the statute, under the guidelines, he's likely 360 to life. He's at least a base offense level 36, just based solely on the amount of drugs involved. He's likely to be attributed an enhancement for

1  leader organizer because it's the government's evidence that he

2  was. He's also likely to receive an enhancement depending on

3  how things shake out for possession of a firearm.

4  Judge, if -- the government realizes that Mr. Thomas

5  is a lifelong resident of Greenwood County. He's most recently

6  lived in Greenville County. To the extent that he is not

7  otherwise a flight risk, anyone facing that amount of time

8  certainly would have an incentive to flee.

9  In addition, Judge, the government believes that he's

10  continually going to be a danger to the community unless he's

11  locked up. Mr. Thomas's -- the best prediction of future

12  behavior is past behavior. After Mr. Thomas was interdicted by

13  law enforcement on October 23 -- 23, 2018, what'd he do? He

14  continued to deal drugs -- well, first of all, he lied to law

15  enforcement. Whether or not he knew that Mr. Latimer was

16  dealing with law enforcement in El Paso -- which they obviously

17  did not -- Mr. Thomas and the others knew that law enforcement

18  in Greenville County seized over $1 million from the group.

19  That didn't deter them. Mr. Thomas continued to deal drugs, and

20  that's evidenced by Mr. Latimer's statements, and not only

21  Mr. Latimer's statement, Judge, the wiretaps confirm that there

22  was at least one other transaction that Mr. Latimer,

23  Mr. McGowan and Mr. Thomas participated in after October 23. So

24  he continued to lie. He was prepared to continue to lie to law

25  enforcement by filing a petition to return the funds that were

seized on October 23.

       And secondly, Judge, Mr. Thomas appears to have no legitimate employment. As stated earlier, 2016 and 2017, he reported a combined income of about $35,000. He's not relying on the car lot business to support himself. There's only one other way to earn money if you're Mr. Thomas, and that is continue dealing drugs. If he is released, the government believes that that's exactly what he'll continue to do. Judge, the Fourth Circuit has found that continued drug distribution is evidence of danger to the community. The government relies on those three instances to support its position.

       Judge, that's the government's presentation. I do -- as I said earlier, Special Agent Randy Smith, is present and is available to answer any questions that Mr. Wise might have as to the issue of detention.

**THE COURT:**   Okay. Thank you very much.

Mr. Wise?

**MR. WISE:**   I'd like to ask Agent Smith a few questions, not in any great length.

**THE COURT:**   We'll have Agent come forward and be sworn.

**THE CLERK:**   Please state your full name for the record, sir.

**MS. WASHINGTON:**   Randy Smith.

               **AGENT RANDY SMITH**

1   having first been duly sworn, testifies as follows:

2          **THE WITNESS:**   I do.

3          **THE CLERK:**   You may be seated.

4                    **DIRECT EXAMINATION**

5   **BY MR. WISE:**

6   **Q**   Mr. Smith, one of the key things y'all were looking for in

7   this case was the pill press?

8   **A**   Was that one of the key things we were --

9   **Q**   I mean, that was an important item you wanted to recover.

10  **A**   It's an item that would've been nice to recover, yes.

11  **Q**   Yeah. And that was turned in, I believe, by the lawyer for

12  Mr. McGowan?

13  **A**   There was a pill press that was turned in. Where --

14  there's absolutely no way to confirm that was the actual pill

15  press that they were using.

16  **Q**   I understand that. I understand that. But a pill press was

17  turned in?

18  **A**   Yes, sir.

19  **Q**   And you had some indication through your surveillance that

20  the pill press was located on a piece of property on -- in the

21  Mountville, South Carolina, area.

22  **A**   Originally, yes. And it was moved.

23  **Q**   And did your surveillance ever have Mr. Thomas at that

24  house in the Mountville, South Carolina, area?

25  **A**   No.

1  **Q**   Now, the original deal was to -- not the original deal,

2  but one of the things that precipitated this, was when

3  Mr. Latimer contacted a DEA agent in New Mexico?

4  **A**   Yes, sir.

5  **Q**   All right. And it was Mr. Latimer that negotiated the

6  price?

7  **A**   Mr. Latimer flew to El Paso ---

8  **Q**   Uh-huh.

9  **A**   --- and while meeting with the two undercover agents, he

10 actually FaceTimed Mr. Thomas.

11 **Q**   Uh-huh.

12 **A**   So the prices were negotiated between Mr. Thomas Latimer

13 and the two undercover DEA agents in El Paso.

14 **Q**   And do you have a recording of that FaceTime? Or is it

15 just that FaceTime was done?

16 **A**   What we have with that is the telephone records that

17 indicate that call did occur between Mr. Thomas and Mr. Latimer

18 at the time that was in question. We also have the undercover

19 agents who identified Mr. Thomas as being the person that was

20 FaceTimed during the negotiations.

21 **Q**   Okay. All right. You don't have any information that

22 Mr. Thomas actually operated any press or anything like that?

23 **A**   No.

24 **Q**   Okay. Thank you.

25         **THE COURT:**   Thank you. Anything further from the

government?

       **MS. WASHINGTON:**   No, Your Honor.

       **THE COURT:**   Okay. Thank you.

       **THE WITNESS:**   Thank you.

       **THE COURT:**   Okay. Mr. Wise, I've already heard from the government on the elements of detention they feel have been met in this case, and I'll hear from you.

       **MR. WISE:**   All right. Your Honor, there is one count in the indictment that Ms. Washington didn't mention that we do really have some serious dispute with, about Mr. Thomas traveling in interstate commerce, but we'll -- I mean, we can deal with that later. I don't -- he says he doesn't recall traveling in this -- connection with this conspiracy.

       First of all, I would like to say this: Mr. Thomas does not have his head in the clouds in this case. He understands clearly the significance of the case, the allegations against him, and what the government generally has against him. Nothing that was said today was a great surprise, maybe a little bit here and there. But the general guts of the conspiracy, none of that was a surprise. He has signed a proffer agreement with the government.

       I do take exception to one thing the government has said in this case about Mr. Thomas. I've met with him a good bit -- well, let me back up. First of all, I take exception that Mr. Thomas lied to the government on December 28 when we

1   wrote a letter to the government about the money they seized.

2   Because the letter clearly states to the government, "Tell us

3   the basis for keeping it." Obviously, they answered that

4   question now. But he did not assert in that letter that this

5   was all legitimately earned. But anyway, that's, you know,

6   neither here nor there, because that money is gone and he has

7   waived any right to it.

8         He does, in fact, have a legitimate business. I do

9   not think the car business is a front for the drug business. I

10   think the car business is actually a very, very legitimate

11   business, totally independent of any alleged drug dealing he's

12   been involved in. I'll point out to the Court that in 2016, he

13   was employed with -- I believe with VELUX?

14         **THE DEFENDANT:** Yes.

15         **MR. WISE:** -- yes, VELUX, in the first half of the

16   year. He actually was working second shift at VELUX. He started

17   getting the idea of opening a car lot -- a car business. He

18   actually would go to a car dealer -- a body shop in the Ninety

19   Six area, learn how to paint cars for about three or four

20   months, before he opened up the car lot. He would do that in

21   the morning; go second shift to VELUX.

22         His basic business plan in this operation was to take

23   damaged cars -- he has some experience with bodywork and that's

24   why he went to learn to paint -- fix them up and then resell

25   them. And he would make his profit from not only the car but,

1    you know, he would then get paid back for all the labor he

2    spent doing it.

3           He also owned his own -- came -- learned how and

4    developed on his own, a financing plan for customers where for

5    the year -- according to the tax returns I have, for the year

6    2017, there were some 18 automobiles that people were paying on

7    by the month for him. So it's not like, you know, he's just out

8    there pretending to be doing business. He was actually,

9    seriously doing business at the car lot.

10           For the year 2017, which was is the first full year

11   he operated the car lot, his income was about $27,000, after

12   expenses. And he anticipates that 2018 would be substantially

13   above that, but obviously has not filed the 2018 tax returns,

14   having been arrested in February of this year.

15           He is a lifelong resident of Greenwood County. He

16   has, for all practical purposes, no -- I think he got arrested

17   on some stuff when he was 18 years of age. But I think even a

18   lot of that was dismissed. So really, he has no criminal

19   record, certainly no prior drug record at all.

20           So he has five children that he supports. And he

21   proudly tells me that he is helping support his five children

22   and none of them have a court order requiring him to do it.

23   He's doing it on his own, voluntarily. His 16-year-old son

24   lives with him, to his credit.

25           The tax returns I've seen tell me -- and I think the

government has the same ones. I showed them to them this
morning -- confirmed that it shows that the car business is a
legit business -- a legitimate business. I actually had to go
to Spartanburg County jail with a power of attorney that
allowed somebody to take over helping run the business while
he's incarcerated. I've never had to do that in a case in my
life. The car lot that he owns is technically not owned by him,
it is being -- he bought it from the owner with the option to
purchase it. So it's -- you know, financed by the owner. So he
does have that legitimate business.

In discussing this matter with him, he tells me that
he has no need -- to run his business -- to go out of Greenwood
County. His house is located on Hitching Post Road, and the
business is literally within a quarter-mile of that location.
He says that if he needs to go buy a car out of the county, he
can get somebody to go do that. He would have no need to leave
Greenwood County.

I've had some serious talks with him and I've had
some serious talks with his mother, who is here -- stand up
please. She's here with many of his friends. As she told me, I
raised him better than this. And I believed her.

He quit school in the 12th grade. Finally got his
GED. Why he quit? I don't know, because he has some good
intelligence. From my discussions with him, I just could not
see him remotely getting back involved in any drug transaction

1    whatsoever. He has authorized me to tell you that if you

2    release him on bond and he flunks a drug test for any illegal

3    drug, he'll just go turn himself in and let him be revoked

4    because he -- I don't see a substance abuse problem in him,

5    which is kind of contradictory in some sense with what he's

6    accused of, but that's what the facts are.

7            I think if you allow him to get out on bond and do an

8    ankle monitor on him, restrict him to Greenwood County, he

9    would be able to get this business going -- I think he

10   understands he's eventually going to jail. That's not a -- he's

11   not delusional about that -- but in able to get it going and

12   have some people to be able to operate it and carry it on.

13           As I said, the business tax returns I've seen say it

14   is truly a very legitimate business. And I assume somebody

15   that's involved in drugs -- there's no drug money, as I see,

16   funneled through the business. Because otherwise, he would have

17   the income of 100,000 dollars a year from this used car

18   business as kind of a money-laundering scheme, but I don't see

19   that at all in this case.

20           I do think he understands his predicament. He

21   understands the situation he's in. I just -- from my

22   conversations with him, I think I can honestly tell the Court

23   that I think the chances of his getting back into anything near

24   this is virtually nonexistent. And if he were a flight risk,

25   frankly, Your Honor, back in October 28 when he kind of -- or

1  23rd when he kind of figured out this gig may very well be up,

2  he didn't flee, he didn't run, he didn't go anywhere, he stayed

3  right where he was until they arrested him in February. So I

4  think the flight risk is very low.

5        He, certainly, you know, was not as active in

6  traveling around as much as Mr. Latimer was and delivering

7  drugs. And the nature -- the exact nature of his involvement

8  we'll probably have to get into in some detail, but I think he

9  is not a flight risk. I don't think he's going to be a danger

10 to the community at all. And certainly, with an ankle monitor,

11 you can restrict his movement to Greenwood County and that

12 would be more than sufficient for him to do what he needs to do

13 to, you know, support his family and get the business going to

14 where he would be able to have, you know, some hope of it

15 continuing after he goes to jail.

16        **THE COURT:**    Thank you.

17        **MS. WASHINGTON:**    Judge, just briefly, I believe

18 Your Honor knows that this defendant doesn't have to leave

19 Greenwood County to conduct his drug business. He didn't. He

20 used Mr. Latimer to do so. He is the record owner operator of

21 E Z Rides in Greenwood County. I would just would point out,

22 Judge, Mr. Wise asked some questions about the traveling

23 interstate commerce. It is the government's evidence that this

24 defendant used his business credit card issued by Wells Fargo

25 to fund the trip to El Paso by Mr. Latimer and Mr. Latimer's

1  friend.

2       Mr. Thomas -- the truth of the matter is Mr. Thomas

3  was a lifelong resident of Greenwood County throughout this

4  conspiracy. The government does not believe the defendant has

5  provided or produced any evidence to rebut the presumption

6  against -- against bail in this case and that he should be

7  detained pending trial.

8       **THE COURT:**   Anything further, Mr. Wise?

9       **MR. WISE:**   Excuse me?

10      **THE COURT:**   Anything further?

11      **MR. WISE:**   Nothing further.

12      **THE COURT:**   Okay. Anything from pretrial?

13      **PROBATION AGENT:**   No, Your Honor.

14      **THE COURT:**   Okay.

15      **MR. WISE:**   Excuse me.

16      **THE COURT:**   Yes.

17      **MR. WISE:**   I think Mr. Thomas would like to make a

18 brief statement.

19      **THE COURT:**   Okay. Just make sure you let your lawyer

20 knows what you're going to say first.

21      **MR. WISE:**   We discussed it.

22      **THE COURT:**   Okay.

23      **MR. WISE:**   Before today.

24      **THE DEFENDANT:**   Yeah, I just want to say I'm not in

25 denial of what's going on. And I didn't have -- much as what

1  was said -- a lot of stuff that been said, I didn't have a lot

2  to do with a lot of stuff that they said, but I'm not in denial

3  of my -- what I had going on in it.

4         **THE COURT:**   Right.

5         **THE DEFENDANT:**   But I just wanted say I was sorry.

6  (Pause.)

7              Let me get right. (Pause.)

8              I don't even think can I get right.

9         **FIRST SPEAKER FROM AUDIENCE:**   Can I say something?

10        **THE DEFENDANT:**   What --

11        **FIRST SPEAKER FROM AUDIENCE:**   I'm his sister.

12        **MR. WISE:**   Excuse me?

13        **FIRST SPEAKER FROM AUDIENCE:**   I'm his sister. Can I

14  say something?

15        **MR. WISE:**   Let me ask.

16        **THE DEFENDANT:**   I just -- my daughter is about to

17  graduate. I've got somebody else running my business. Like he

18  said, I know I'm going to have to do some time. I just want to

19  get the house arrest to tell my kids to their face, you know,

20  to let them know what went on with me, because I don't want to

21  have to tell them through no phone.

22             I ain't never had no passport. I ain't never flew on

23  a plane.

24             But -- and I know I done -- I know I done caused

25  trouble in my family life and I wanted to let them know, you

know, be able to go home and let them know I know what I did,
this what's about to happen, and be able to -- be able to do my
time because I've never been in no trouble before. I haven't --

      **THE COURT:**  Which is -- which is very unusual for
somebody in your position to be involved in something like this
and not have any prior history in this. And that's what --
that's what my -- that's what's causing me dilemma here
today ---

      **THE DEFENDANT:**  Yeah.

      **THE COURT:**  --- because the fact that you didn't
have a background doing this, but yet what you were involved in
was extremely dangerous.

      **THE DEFENDANT:**  Yeah. Yeah.

      **MR. WISE:**  And Your Honor, as I say, it's a big
disappointment to his mother.

      **THE DEFENDANT:**  Yeah. And if she -- if she really
knew really what was going on, she'll know that I didn't --

      **MR. WISE:**  We'll go to that later.

      **THE DEFENDANT:**  -- you know.

      **MR. WISE:**  That's all.

      **THE DEFENDANT:**  But at the same time, Your Honor,
that's what I'm giving my all for, just to be able -- you can
restrict me to the house -- to home. And if I ever fail a drug
test, you can lock me back up. If I do ever violate in any type
of one, you can lock me right back up. But my family, they

1  solely, like, depend on me. And I really want to be able to,

2  you know, talk to them and let them know what's going on. And I

3  promise I won't -- I won't cause no problems.

4          **MR. WISE:**   Thank you.

5          **THE DEFENDANT:**   You know, I'm sorry about that.

6          **MR. WISE:**   But he does have people here. If you are

7  here for Donald Thomas, would you just stand please.

8      (The audience complies.)

9          **MR. WISE:**  He does have community support.

10          **THE COURT:**   Uh-huh.

11          **MR. WISE:**   Not for his activities, but for him as a

12  human being.

13          **SECOND SPEAKER FROM AUDIENCE:**   And we love him and

14  we're very proud of him.

15          **THIRD SPEAKER FROM AUDIENCE:**   We love you.

16          **SECOND SPEAKER FROM AUDIENCE:**   We're very proud of

17  you, baby.

18          **FOURTH SPEAKER FROM AUDIENCE:**   Yes.

19          **SECOND SPEAKER FROM AUDIENCE:**   You'd never

20  disappoint me.

21          **FIRST SPEAKER FROM AUDIENCE:**   When he left --

22          **THE COURT:**   Yeah. If you're going to say anything,

23  we need to put you under oath to put any testimony on the

24  record. Of course, I'm going to let his mom speak. Because

25  mamas are -- mamas are special. So...

**SECOND SPEAKER FROM AUDIENCE:**   Like I said, I'm very proud of you, baby. You would never disappoint me. You're the best son that anybody could ask for. I love you. We all love you. You always mean something to us. You always -- you helped so many people, and they tell me every day. They tell me how you support them when they was sick. They tell me when they are sick, you went and did things for them, which you didn't have to. So I'm very proud of you.

**THE DEFENDANT:**   Yes, ma'am.

**SECOND SPEAKER FROM AUDIENCE:**   And we all make mistakes. Nobody's perfect.

**THE DEFENDANT:**   Oh, man.

**MR. WISE:**   And I agree with Your Honor's comment that to be involved in something like this, with not even a simple possession of cocaine charge, it --

**THE COURT:**   Yeah.

**MR. WISE:**   -- and, you know, his mother has been to see me several times and we've talked about it. It's just -- it's just a big inconsistency.

**THE COURT:**   Yeah.

**MS. WASHINGTON:**   Judge, obviously, I have to add. I don't disagree with anything the family has said ---

**THE COURT:**   Right.

**MS. WASHINGTON:**   --- but this conduct occurred over a period of time. This was not one instance or -- cannot be

1  considered aberrant behavior on this defendant's part. I don't

2  doubt that he may be a good person, but what -- the

3  government's interested in providing just punishment and

4  addressing the conduct.

5  **THE COURT:**  Right. Anything further from pretrial?

6  **PROBATION AGENT:**  No, Your Honor.

7  **THE COURT:**  Okay. What I'm going to do today is: I'm

8  going to deny the government's motion for detention, but I am

9  going to set bond at $100,000 secured, standard conditions,

10 with house arrest and location monitoring, which will be GPS

11 monitoring. If he's able to make that bond, then we'll

12 reconvene to make sure that residence is confirmed.

13  Mr. Thomas, I hope you don't prove me wrong here. Do

14 you under -- if you could look at me while I'm talking to you.

15 I hope you do not prove me wrong. I believe you when you say

16 that you will not go back out and do this again or get back

17 involved in this. If you do, we won't even have a hearing. If I

18 hear anything from probation or the government that you've gone

19 back out and gotten back involved in this -- this activity -- I

20 hope that you are telling your mother the truth ---

21  **THE DEFENDANT:**  Yeah, I am.

22  **THE COURT:**  --- that you will not do this again.

23  **THE DEFENDANT:**  I am. Thank you.

24  **MS. WASHINGTON:**  Your Honor, I just want to put the

25 Court and the defendant on notice that the government's going

1  to inquire as to the source of any property or funds used to

2  secure any bond that's executed in this case. The government

3  put other defendants on notice that any property that's

4  outstanding and any attempt to dissipate or transfer or hide

5  such property is going to be considered obstruction of justice,

6  and that applies to Mr. Thomas, too.

7          **MR. WISE:**  On that, I would add, too, Your Honor, is

8  that if we're going to reconvene, formally do it, I'm going to

9  be out of town Wednesday through the rest of this week. So it

10 would be --

11         **THE COURT:**  That's fine.

12         **MR. WISE:**  -- it would have to be some time next

13 week.

14         **THE COURT:**  That's fine. I just want probation ---

15         **MR. WISE:**  Right.

16         **THE COURT:**  --- to be able to confirm an address and

17 make sure that location monitoring can be set up.

18         **MR. WISE:**  Okay.

19         **THE COURT:**  So if you're not here, it's okay with

20 me, as long as it's okay with --

21         **MR. WISE:**  Okay. You had talked about reconvening

22 though, I gathered, and come back before you.

23         **THE COURT:**  Right. Right. I've set conditions today,

24 however.

25         **MR. WISE:**  All right. Okay.

|     |                                                                           |
|-----|---------------------------------------------------------------------------|
| 1   | **THE COURT:**  But I just need probation to be able to                   |
| 2   | confirm wherever he's going to live, so that monitoring can be            |
| 3   | set up.                                                                    |
| 4   | **MR. WISE:**  Okay.                                                       |
| 5   | **THE COURT:**  Just make sure you go over conditions of                  |
| 6   | bond so that he understands what ---                                      |
| 7   | **MR. WISE:**  Please do.                                                  |
| 8   | **THE COURT:**  --- violations are.                                       |
| 9   | **MR. WISE:**  Please do. We won't have a dispute on it.                  |
| 10  | **MS. WASHINGTON:**  Judge, it would also be helpful if                   |
| 11  | Mr. Wise can document the source of the property or funds that           |
| 12  | you intend to be used to secure any bond.                                 |
| 13  | **THE COURT:**  Just so we don't have any issues.                         |
| 14  | **MR. WISE:**  We won't have any issues.                                  |
| 15  | **THE COURT:**  Mr. Wise, do you understand what the                     |
| 16  | government's saying? You understand what the government's                 |
| 17  | position is?                                                              |
| 18  | **MR. WISE:**  I do. I do. There shouldn't be an issue                   |
| 19  | on that.                                                                  |
| 20  | **THE COURT:**  Okay. Anything further?                                   |
| 21  | **MS. WASHINGTON:**  Nothing from the government.                         |
| 22  | **MR. WISE:**  You're going to go over the conditions of                 |
| 23  | the bond?                                                                 |
| 24  | **THE COURT:**  Well, I want you to go over the                          |
| 25  | conditions of bond ---                                                    |

1        **MR. WISE:**  Okay. Okay.

2        **THE COURT:**  --- with him. Just make sure he

3 understands what they are.

4        **MR. WISE:**  I will.

5        **THE COURT:**  I'm not sure if there is any order in

6 this case that co-defendants not communicate with each other.

7        **MR. WISE:**  There really isn't, and that can create

8 one little problem. A co-defendant, who's way down on the list,

9 has been helping him in his business even before this started.

10 And she lives in Simpsonville and drives down occasionally, so

11 it's not like they're going to be in the same house. So that

12 may be the only rub. The rest of the defendants, no problem

13 whatsoever.

14        **MS. WASHINGTON:**  Your Honor, it's also my

15 information that Demetris Goode, formally an employee of

16 E Z Rides continues operate -- or helps operate Mr. Thomas's

17 business.

18        **MR. WISE:**  Uh-huh.

19        **MS. WASHINGTON:**  Judge, the defendant is facing --

20 is waiting sentencing before Judge Cain. He's released on bond.

21 His sentencing was scheduled last week and was continued for a

22 short time. The government would ask the Court to make a

23 condition of Mr. Thomas's bond that he also have no contact

24 with Mr. Goode and others similarly situated, not just

25 co-defendants in this case.

1          **THE COURT:**    Is that going to be an issue?

2          **MR. WISE:**    That's no problem.

3          **THE COURT:**    Mr. Thomas, is that going to be an

4     issue?

5          **MR. WISE:**    No, ma'am.

6          **MS. WASHINGTON:**    No contact direct or indirect.

7     Sorry.

8          **THE COURT:**    Okay.

9          **MR. WISE:**    We'll just -- that'll just make it

10    cleaner.

11         **THE COURT:**    Okay. So as a condition -- an additional

12    condition of your bond would be that you have no contact

13    directly or indirectly with any other co-defendants in this

14    case.

15         **MR. WISE:**    Yes, ma'am.

16         **THE DEFENDANT:**    Yes, ma'am.

17         **THE COURT:**    Okay. Anything further?

18         **MS. WASHINGTON:**    Not at this time, Judge.

19         **THE COURT:**    Okay. Thank you very much.

20         **MR. WISE:**    Thank you.

21       (Court is adjourned at 12:04 p.m.)

22

23

24

25

1                                    ***

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5     /s/ Teresa B. Johnson                    May 7, 2019

6    Teresa B. Johnson, CVR-M-CM, RVR, RVR-M          Date

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25